1  PAUL L. GALE (SBN 065873)
   paul.gale@troutman.com
2  PETER N. VILLAR (SBN 204038)
   peter.villar@troutman.com
3  LAUREN E. GROCHOW (SBN 293601)
   lauren.grochow@troutman.com
4  NICHOLAS J. SCHUCHERT (SBN 307249)
   nicholas.schuchert@troutman.com
5  TROUTMAN SANDERS LLP
   5 Park Plaza, Suite 1400
6  Irvine, CA  92614-2545
   Telephone:  949.622.2700
7  Facsimile:   949.622.2739

8  Attorneys for Defendant and
   Counterclaimant
9  PARKER HANNIFIN CORPORATION

*(left margin, vertical)* TROUTMAN SANDERS LLP / 5 PARK PLAZA / SUITE 1400 / IRVINE, CA 92614-2545

10              UNITED STATES DISTRICT COURT
11           CENTRAL DISTRICT OF CALIFORNIA
                  SOUTHERN DIVISION

| | |
|---|---|
| 12  VALCOR ENGINEERING CORPORATION, a New Jersey corporation, | Case No.  8:16-cv-00909-JVS (KESx) |
| 13 | Hon. James V. Selna |
| 14              Plaintiff, | **PARKER HANNIFIN CORPORATION'S SECOND AMENDED COUNTERCLAIM FOR:** |
| 15       v. | |
| 16  PARKER HANNIFIN CORPORATION, an Ohio corporation, | **(1) BREACH OF CONTRACT** |
| 17 | **(2) BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING** |
| 18              Defendant. | |
| 19 ──────────────── | **(3) FRAUD** |
| 20  PARKER HANNIFIN CORPORATION, an Ohio corporation, | **(4) UNLAWFUL AND UNFAIR BUSINESS PRACTICES IN VIOLATION OF CAL. BUS. & PROF. CODE §17200** |
| 21 | |
| 22              Counterclaimant, | **(5) DECLARATORY RELIEF** |
| 23       v. | **DEMAND FOR JURY TRIAL** |
| 24  VALCOR ENGINEERING CORPORATION, a New Jersey corporation, | |
| 25 | |
| 26              Counter-Defendant. | |

27       [REDACTED VERSION PURSUANT TO
28      COURT ORDERS DATED 2/13/18 & 3/1/18]

33902881

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

Defendant and Counterclaimant Parker Hannifin Corporation ("Parker") hereby asserts its Second Amended Counterclaim against Plaintiff and Counter-Defendant Valcor Engineering Corporation ("Valcor").

## Introduction

1.    In 2004, Parker entered into the Strategic Procurement Agreement ("SPA") with Valcor's Electroid division ("Electroid"), whereby Electroid agreed to supply air separation modules ("ASMs") to Parker for use in Boeing 737 fuel tank inerting systems.  When it entered into the SPA in 2004, Parker could not have possibly imagined Electroid's fraudulent and deceitful conduct that would flow from that relationship.

2.    The ASMs were intended to remove oxygen from a compressed air stream generated from the airplane's engine (referred to as "bleed air") and then deliver nitrogen-enriched air into the airplane's fuel tank, thereby reducing the risk of flammability by creating an inert gaseous environment.  ASMs have an outer shell (i.e., the ASM housing or canister) and a fiber membrane cartridge, which consists of thousands of permeable fibers and tube sheets.  Tube sheets consist of a cured epoxy which fills the void space between the fibers to hold the ASM fibers in place and ensure that the inlet air stream flows into the fibers as opposed to around them.  Valcor subcontracted with MEDAL, a division of Air Liquide Advanced Technologies, US LLC ("MEDAL Air Liquide") to supply the ASMs' core fiber membrane cartridge components.

3.    From the outset, Valcor, through the President of its Electroid division, Steve Etter ("Etter"), and others, intentionally misrepresented the quality and completeness of the ASMs' qualification testing, including contamination testing.  As a result, Electroid began delivering ASMs to Parker before their performance capabilities had been fully scrutinized.  Given Electroid's failure to conduct adequate pre-production testing, its subsequent product failure should have come as no surprise to Electroid.

1       4.    However, Electroid was not about to forfeit its lucrative arrangement

2   with Parker by admitting that, unbeknownst to Parker, the ASMs that Electroid

3   manufactured and sold to Parker were defective and unable to withstand the

4   airplane's environment in which they were to operate.  While, internally, Etter

5   recognized Electroid's ASM design and manufacturing failures and began covertly

6   attempting to correct them, he instructed his cohorts to manipulate the data

7   disclosed to Parker and other supply chain members to "keep all the attention off of

8   us."

9       5.    Instead of collaborating with Parker in good faith to determine the root

10  cause of its ASMs' defects, unbeknownst to Parker, Electroid decided to attempt to

11  eliminate Parker from the supply chain altogether.  Electroid used the technology it

12  jointly developed with Parker, as well as the knowledge it acquired from its

13  investigation of its ASMs' failures, to develop modified and improved ASMs –

14  which Electroid dubbed "Gen2" and "Gen3" – to manufacture and offer for sale

15  directly to Parker's longstanding customers and competitors, in a flagrant attempt to

16  unfairly compete with Parker in the marketplace.

17      6.    A sales pitch that Electroid made to one of Parker's competitors even

18  included a side-by-side comparison between the original defective ASM that

19  Electroid sold to Parker and the modified and improved Gen2 and Gen3 ASMs.

20  Electroid did this while continuing to handsomely profit from selling Parker its

21  current defective and refurbished ASMs to replace those that had already failed and

22  been returned to Parker under Parker's warranty program.  Parker, to its extreme

23  detriment, continued to diligently seek to resolve the product deficiency problem,

24  and as a result, wasted considerable time, effort and resources, in addition to

25  suffering significant damage to its reputation and market share.

26      7.    Once Electroid was ready to promote and market Gen2 and Gen3,

27  Electroid feigned that it was working with Parker in good faith to continue to search

28  for the cause of its ASMs' defects, while Electroid secretly schemed to hinder and

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

1    delay Parker's discovery of what Electroid already knew was the root cause of the

2    failures.  Electroid employed many delay tactics, including, for example, urging

3    that the presence of excessive contaminants was the root cause, even after Electroid

4    and MEDAL Air Liquide conclusively determined that those contaminants could

5    not possibly have been the root cause.

6          8.     By early 2016, Electroid still would not provide assurances that it

7    could deliver ASMs to Parker that complied with its contractual obligations.  As a

8    result, Parker made a series of demands that Electroid reimburse Parker for the

9    millions of dollars in damages that Parker had incurred because of the defective

10   Electroid ASMs.  Parker also notified Electroid that it would be transitioning to an

11   alternate supplier the following year.  Rather than reimburse Parker for all the

12   damage it had caused, Valcor instead reflexively filed this lawsuit in a futile

13   attempt to paint itself as the alleged victim.  In fact, Parker is the true plaintiff in

14   this litigation.

15         9.     As part of its malicious litigation strategy, Valcor has continued to do

16   everything imaginable to keep Parker from discovering the true cause of the ASMs'

17   failures.  For example, several months into the litigation, after Valcor failed to

18   produce documents in response to Parker's discovery requests, Parker was forced to

19   seek court intervention by bringing a motion to compel the production of

20   documents.  During that process, Valcor was compelled to disclose not only that it

21   had concealed highly relevant documents, appropriately deemed "Heartbeat

22   Reports," but that it had secretly destroyed an entire e-mail server in October 2013,

23   despite the SPA's express contractual obligation to preserve that data.

24         10.    The Court agreed with Parker that Valcor "did not act reasonably" by

25   concealing the server destruction up to that point in the litigation.  The Court also

26   ordered Valcor to produce the improperly withheld documents and reimburse

27   Parker for its reasonable expenses.

28

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

PARKER HANNIFIN CORPORATION'S SECOND AMENDED COUNTERCLAIM

11.     But even more egregious – and shocking – on June 21, 2017, more than one year after Valcor filed this lawsuit, Valcor claimed, for the very first time, that it believed that its defective ASMs could cause "a fuel tank [ ] to combust and/or cause an airplane to explode or crash" and alleged that its ASMs "increase[ed] the risk of flammability in Boeing 737 aircraft fuel tanks, which could cause an airplane explosion, property damage, personal injury, and/or death."  (First Amended Complaint ("FAC") (Dkt. 112) ¶164(A)(iv).)  Despite its alleged belief that Electroid's ASMs posed a grave risk to public safety, Valcor concealed this information from Parker, the public, and the Federal Aviation Administration ("FAA").  Nonetheless, for years after allegedly learning about its own product's alleged potential to cause an airplane to explode, Electroid continued to supply the self-described alleged dangerous ASMs to Parker, and handsomely profited by doing so.

12.     While Valcor continues to blame its own manufacturing shortcomings on Parker's alleged failure to disclose certain information, the truth lies elsewhere. Electroid's fraudulent scheme began almost immediately after the parties entered into the SPA, in that Electroid, but not Parker, had knowledge of Electroid's ASMs' defective design and manufacturing.  Electroid fraudulently concealed this information for years and made multiple affirmative misrepresentations to keep Parker from discovering the truth, including Electroid's recent claim that the defective ASMs could cause airplanes to explode, a contention asserted not only in the FAC, but by Valcor's attorneys in open court, who exclaimed that the failures were "mission critical."  (Aug. 21, 2017 Hearing Tr. at 21:3-8.)

13.     Electroid's misconduct, from day one to the present, not only constitutes material breaches of a substantial number of the SPA's provisions and breaches of the implied covenant of good faith and fair dealing, but it also constitutes fraud through the many material omissions, concealments and affirmative misrepresentations that Electroid has made to perpetuate its greedy and

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

- 4 -

1   dishonest scheme, as well as unlawful and unfair conduct under California's Unfair

2   Business Practices Act.

3                              **The Parties**

4          14.    Parker is an Ohio corporation headquartered in Cleveland, Ohio.

5   Parker's Fluid Systems Division, which was responsible for procuring the ASMs

6   that are the subject of this lawsuit, is located in Irvine, California.  Parker has

7   designed and developed fuel tank inerting systems for military aircraft since the

8   1960's and for commercial airplanes since the late 1990's.

9          15.    Valcor is a New Jersey corporation headquartered in Springfield, New

10  Jersey.  Electroid is a division of Valcor that held itself out to be an industry leader

11  in the design and manufacture of air separation modules used to generate nitrogen

12  for fuel tank inerting applications.

13                          **Jurisdiction and Venue**

14         16.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1332.

15  Parker and Valcor are citizens of different states, and the amount in controversy

16  exceeds the sum or value of $75,000, exclusive of interest and costs.

17         17.    Venue is proper in this judicial district pursuant to 28 U.S.C. §1391,

18  because Parker's Fluid Systems Division is located in this district and a substantial

19  part of the contract and events giving rise to the counterclaim occurred in this

20  district.

21                      **Facts Common to All Claims**

22         18.    On July 7, 2004, Boeing, the world's largest aerospace company and

23  leading manufacturer of commercial jetliners, awarded a contract to Honeywell to

24  build a fuel tank inerting system for Boeing 737 airplanes, known as Nitrogen

25  Generation Systems ("NGS"), or On Board Inert Gas Generation Systems

26  ("OBIGGS").  Honeywell chose Parker to provide core components for this system.

27  Parker entered into the SPA with Valcor through its Electroid division on May 25,

28  2004, whereby Electroid would supply the ASMs to Parker.  The SPA was

PARKER HANNIFIN CORPORATION'S SECOND AMENDED COUNTERCLAIM

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

amended on August 9, 2007 ("Amendment #1"), November 3, 2008 ("Amendment #2"), December 2, 2013 ("Amendment #3") and January 26, 2018 ("Amendment #4") (collectively, the "Amendments"). The SPA, the Amendments, and all other documents referenced in and incorporated into the SPA are collectively referred to herein as the "SPA." (A partial copy of the SPA is attached to Valcor's FAC as Exhibit 3.)

19.  The SPA set forth extremely detailed conditions that the Electroid ASMs were required to meet, including a 27,000-hour service interval requirement. The ASMs also were required to withstand certain levels of chemical exposure in the in-service operating environment, including exposure to ozone and vapors – two different chemical factors that could distinctly impact the ASMs' performance – as detailed in the SPA's Specification Control Drawing ("SCD"). The SCD also details that "[a] coalescing HEPA [high efficiency particular air] filter will be placed upstream of the equipment to eliminate particulates and liquids/liquid aerosols. However, gasses and vapors, including decomposition products of liquids, will be present in the equipment inlet flow. The equipment *shall* be designed to tolerate exposure to the contaminants and limits defined." The HEPA filter used in the fuel tank inerting system sold to Boeing was manufactured by Porvair, a UK company specializing in filtration products. The SCD then details the maximum levels of certain gases, including ozone and vapors that the Electroid ASM must tolerate.

**Electroid's Pre-SPA Testing**

20.  Parker required that Electroid conduct significant contaminant testing even before it entered into the SPA. That is because contaminants are inevitable in the ASM operating environment. Therefore, even though there is a Honeywell ozone converter upstream of the ASM to reduce the amount of ozone, as well as the HEPA filter to reduce the number of particulates, liquid aerosols, and liquids, all parties understood that the ASM would be exposed to contaminants when airborne.

21.     Thus, in 2003, one year before entering into the SPA with Parker, and as part of the ASMs' product development program, Electroid purportedly performed extensive testing to determine the effect of the ASMs' exposure to a great number of potential contaminants found in the operating environment.  As part of that testing, Electroid worked with those who had the most accurate and complete data for the actual operating environment – Boeing and Honeywell – in analyzing the impact of the in-flight environment on the ASMs' performance.

22.     As part of the bidding process, Electroid made numerous detailed presentations to Parker, Honeywell and Boeing, led in part by Etter.  Of particular note was a presentation titled "ASM CONTAMINATION TEST RESULTS" delivered on NOVEMBER 4, 2003 by Etter and several representatives of Innovative Membrane Systems, Inc. ("IMS"), a company MEDAL Air Liquide would later acquire that had been the original contracting party with Electroid, and a presentation by Etter and Gary Witts, Electroid's Director of Engineering, titled "OBIGGS CONTAMINATION TESTING."  These two presentations disclosed the testing Electroid allegedly had completed and the impact of exposure to contaminants on its ASMs.  Electroid presented evidence of its testing for ozone, acetaldehyde, and an extensive variety of vapors, gases and liquid contaminants that could be present in the ASM operating environment.  Electroid also specifically raised concerns that there could be certain acidic properties in the airborne environment.

23.     Because of its alleged testing efforts and work with Honeywell and Boeing, Electroid obviously was the party best situated to know what contaminants its ASMs could withstand.  Thus, Electroid also was in the best position to know if the SPA's identification of potential contaminants was incomplete, or if the contaminants' levels identified were inaccurate, particularly since the SPA required Electroid to "verify that its design meets the SCD."  (Attachment C §8.2.) Moreover, the SPA expressly required Electroid to "track and analyze in-service

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

1    data and correct all design deficiencies to comply with the requirements and intent

2    of the SCD."  (Attachment B §12.0(l).)

3                   **Parker's Customers Begin Returning Defective ASMs**

4          24.    Unbeknownst to Parker, Electroid had known for many years that the

5    tube sheets MEDAL Air Liquide sold to Electroid contained manufacturing defects.

6    Long before the first defective ASM was returned to Parker, Electroid had sent

7    MEDAL Air Liquide multiple Defective Material Reports and had instituted at least

8    one Corrective Action Plan to resolve issues reflecting ongoing defective product

9    issues, including voids and discoloration in the ASMs' tube sheets.

10         25.    In 2008, Electroid's ASMs began failing due to tube sheet durability

11   issues.  In 2009, Electroid audited MEDAL Air Liquide.  Electroid also

12   collaborated with MEDAL Air Liquide to prepare a Root Cause Corrective Action

13   Plan to determine the best course to attempt to eliminate Electroid's ASMs' defects.

14         26.    The corrective measures that Electroid and MEDAL Air Liquide

15   implemented did not resolve the ASMs' failures, which had increased to an

16   unacceptable rate.  This resulted in Boeing's and Honeywell's involvement and

17   Electroid ordering a material analysis of its product in March 2011 to investigate

18   returned defective ASMs.

19                 **Electroid Conceals Material Information from Parker**

20         27.    In 2011, pursuant to §5.0 of the SPA, Parker requested that Electroid

21   provide a corrective action report with a defect analysis.  Electroid thereafter

22   provided an analysis that focused almost entirely on potential contaminants in the

23   bleed air being fed into the ASMs, but paid little attention to the ASMs'

24   manufacturing process.

25         28.    By at least mid-2012, through another audit, Electroid knew that

26   MEDAL Air Liquide had made significant changes to the manufacturing, design

27   and materials found in the tube sheets and epoxy that were used in the ASMs, but

28   actively concealed this fact from Parker.  Etter worked closely with MEDAL Air

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

Liquide, having pre-audit discussions about what would be reviewed and thereafter made numerous edits to the audit report before it ultimately was provided to Parker.

29.     In the aerospace industry, immediate disclosure of design, material and manufacturing changes is critical.  ASMs are products that must receive FAA certification.  These manufacturing changes alter the qualification submittal to the FAA, which is why the SPA expressly required that Electroid disclose such changes to Parker.  (Attachment B §11.2; Quality Assurance Purchase Order Clauses for Parker Aerospace Suppliers ("Purchase Order Clauses") §§3.3.1, 3.3.3.) The fact that Electroid's supplier made these changes did not matter.  It was still Electroid's responsibility to disclose these changes to Parker as soon as they were made.  Thus, Electroid breached the SPA by delaying the disclosure of many of these changes until its submission of a 2012 audit to Parker, since most of the changes occurred years before the audit was submitted.  Indeed, many should have been disclosed during the 2009 audit mentioned above, if not sooner.

30.     By manipulating what was disclosed in the audit and by guiding MEDAL Air Liquide to conceal information, Electroid maintained control over the flow of information from its supplier to Parker.

31.     Electroid manipulated the flow of data while Parker continued, in good faith, to work in collaboration with Electroid, MEDAL Air Liquide, Honeywell and Boeing to evaluate the root cause of the failures of Electroid's ASMs, including incurring considerable time, effort and expense in generating a September 20, 2012 Root Cause Report on Returned 737NG ASM's (the "Root Cause Report").

32.     The Root Cause Report reflected that, as of that time, 190 ASMs had been returned due to in-service failures and that, on average, the returned ASMs had only accumulated approximately 9,100 flight hours and 4,600 flight cycles.

33.     The Root Cause Report indicated that "[t]he predominant failure mode of the ASM is a structural failure of the inlet tube sheet manifesting as cracks" which "enable ASM inlet and nitrogen-enriched air to leak directly to the waste

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

flow port, thereby degrading ASM performance."  The Root Cause Report listed

"[f]iber degradation" as a secondary concern.

### Electroid Secretly Develops "Gen2" and "Gen3"

34.     As Parker has now discovered, but only because of Electroid's recent

court-ordered produced documents, Etter had long ago planned to conceal all

technical information about its Gen2 and Gen3 ASMs from Parker.  At least as

early as February 2013, Etter openly told one of Parker's customers – on the day

before Electroid was to meet with Parker to further discuss the investigation into

Electroid's ASMs' failures – that he "███████████████████████████,"

regarding the Gen2 and Gen3 ASMs.  In other words, Electroid hypocritically

claimed that it was fearful that Parker would do to Electroid what Electroid secretly

was already doing to Parker.  But unbeknownst to Parker, Electroid already had

found the root cause of its defective ASMs and was using its knowledge to secretly

develop its improved Gen2 and Gen3 ASMs, while at the same time, continuing the

charade of working with Parker under the Corrective Action Plan as if the solution

had yet to be discovered.

35.     From the time that Parker first learned of the ASMs' failures, Electroid

appeared to be performing as if it was working in good faith to determine the root

cause.  However, based on Valcor's most recent court-ordered document

productions and long-awaited court-ordered MEDAL Air Liquide document

production, it is now readily apparent that Electroid's conduct was counterfeit.

Even before entering into the SPA with Parker, Electroid knew its product was

defective, but when those defects were revealed years later, Electroid incessantly

blamed Parker for Electroid's ASMs' failures.  This was an attempt to deter Parker

from seeking a substitute supplier, while at the same time, ensuring that the ASM

orders from Parker to Electroid would continue at the same pace, or even increase,

as Parker was forced to order replacement ASMs to satisfy its customers' perpetual

warranty claims.

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

36.  Electroid's game plan was simple.  Under the guise of taking corrective action, Electroid sought to delay Parker's discovery of the reasons for Electroid's ASMs' defects, while at the same time, Electroid secretly attempted to entice Parker's customers and competitors with its next generation versions of its defective ASMs – Gen2 and Gen3 – in a flagrant attempt, as Electroid expressed it to MEDAL Air Liquide, to "do an end-run around Parker" and substantially reduce Parker's share of the market.

37.  Even in its FAC, Valcor continues to blame contaminants for its ASMs' failures.  However, despite having ostensibly cured, or at least reduced, its products' defects by surreptitiously developing Gen2 and Gen3 and having direct access to Boeing and Honeywell's in-service operating data, Electroid's FAC still fails to specifically identify what contaminant purportedly is to blame for its ASMs' failures.  This further proves that Electroid's contamination theory is nothing but a prevarication.

### Electroid Falsely Blames Contaminants as the Reason for the ASMs' Defects

38.  Despite mounting evidence that contaminants were not the reason for the ASMs' defects, Electroid almost exclusively focused on unspecified contaminants as the cause of the ASMs' failures.

39.  Electroid has always taken whatever course of conduct is necessary to deflect the investigation from its ASMs' manufacturing defects.  As Etter admitted in an email to MEDAL Air Liquide regarding the Root Cause and Corrective Action Report, "[w]ant to think about embellishing some of the sentences to keep all the attention off of us."

40.  From there, Electroid continued to put forth various theories that contaminants were responsible for its ASMs' failures, even after these theories were determined to be unlikely sources.

Troutman Sanders LLP
5 Park Plaza
Suite 1400
Irvine, CA 92614-2545

- 11 -

PARKER HANNIFIN CORPORATION'S SECOND AMENDED COUNTERCLAIM

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

41.     As Electroid's Director of Contracts, Hal Sorensen, explained in an October 3, 2012 letter to MEDAL Air Liquide, Electroid expressly believed that by asserting its contamination theory, it could "push back Parker" and therefore keep "Parker from pursuing [its] contractual remedy against Electroid and MEDAL…"

42.     Electroid has employed this "push back" technique throughout its relationship with Parker, asserting baseless failure theories to deflect from the true cause of its ASMs' failures.  For example, much later in a November 25, 2015 letter to Parker, Etter urged acetic acid testing as the reason for the ASMs' failures, arguing that it was "suspect to be present in the in-service operating environment," despite having purportedly tested for acetic acid before qualifying the ASMs for production and again during the investigation with Parker.

43.     Electroid's long paper trail shows acetic acid (or peracetic acid) was not the reason for the ASMs' failures.  On September 25, 2003, even before entering into the SPA, a report presented to Etter by IMS (a report which was concealed from Parker), addressed the concern regarding the presences of acid contaminants in the operating environment, including acetic acid.  The report concluded that the IMS "membranes have been exposed to strong acids such as HCl without any problems in a refinery environment.  HCl is a far stronger acid than any organic acid that was proposed.  We suggest that our membranes have already survived and passed the acid gas vapor test by similarity."  Two months later, in a November 4, 2003 presentation to Parker given by Electroid and IMS, Electroid and IMS addressed acid gases, but represented to Parker that a liquid acid immersion test would be extreme and not appropriate, despite having already tested its ASMs just over a month earlier using a liquid emersion test with a strong acid.

44.     Despite possessing undisclosed knowledge that strong acids did not impact its ASMs, during the investigation into the ASM failures that began in 2012, Electroid and MEDAL Air Liquide still pushed for testing the impact of peracetic acid and acetic acid on the ASMs.  During that investigation, acetic acid was

identified to be the byproduct of peracetic acid reacting with the ASMs'
membranes.  A report generated by MEDAL Air Liquide dated September 23, 2013
reflects that MEDAL Air Liquide purportedly tested the impact of peracetic acid
during the investigation and consistent with its September 24, 2003 report described
in paragraph 43 above that had not been shared with Parker, tests concluded that
"███████████████████████████████████████████"  In a later
presentation dated March 19, 2014, prepared after further testing, MEDAL Air
Liquide concluded that "[p]eracetic acid exposure, equivalent to more than 27,000
flight hours, did not decrease tubesheet strength."  This representation is consistent
with representations that Etter and Larry Wismer ("Wismer"), Electroid's Director
of Marketing and Sales, made to Honeywell on August 26, 2014, claiming that
Electroid's "████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████"

45.     Despite knowing that peracetic acid and its more benign byproduct,
acetic acid, formed through a reaction with the ASM itself and not the bleed air and
were not the cause of the ASMs' failures, Electroid still advocated this theory in its
November 25, 2015 letter to Parker referenced above in paragraph 42.  Indeed,
Electroid continued to urge this long-ago rejected theory in its FAC: "Boeing
confirmed that acetic acid is a product of peracetic acid and that acetic acid was
found on all returned ASMs.  Parker was now on notice that air contaminated
beyond the specifications provided by Parker was passing through the Parker Filter
and degrading the ASM, and was potentially the root cause of the early returns on
the ASMs."  (FAC at ¶32.)

46.     Electroid made affirmative misrepresentations by knowingly
demanding that peracetic and acetic acid be investigated and insisting that they
could be the cause of the ASM failures, while knowing that such acids could not

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

PARKER HANNIFIN CORPORATION'S SECOND AMENDED COUNTERCLAIM

1    have been the cause of the failures.  These affirmative misrepresentations were

2    made to deflect from and conceal the true cause of the Electroid ASM failures.

3          47.    Similarly, on more than two dozen instances in its FAC, Valcor

4    contended that ozone is a cause of its ASMs' failures.  However, Valcor knows

5    such contentions are untrue.  Not only did the SPA expressly detail that ozone

6    would be present in the operating environment, even with there being an ozone

7    converter upstream of the ASM, but Electroid purportedly tested the impact of

8    ozone on its ASMs and Etter presented the purported results of those tests to Parker

9    on February 6, 2003 and on November 4, 2003, before the parties entered into the

10   SPA.  Moreover, early in the root cause investigation, MEDAL Air Liquide sent an

11   October 4, 2011 memorandum to Etter, which claimed that "████████████████

12   ████████████████████████████████████████████████████████████████████████

13   ████████████████████████████████████████████████████████████████████████

14   ████████████████████████████████████████████████████████

15   ████████████████████████████████████████████████"  Etter apparently

16   reinforced this theory in discussions with Parker's customers, as recorded in

17   Wismer's "Detailed Notes" summarizing a June 2, 2016 meeting between

18   Electroid, MEDAL, Boeing, Honeywell, and others (but not Parker), "████████

19   ████████████████████████████████████████████████████████."

20         48.    Moreover, if ozone were the culprit contaminant behind the Electroid

21   ASM failures, then the failed ASMs did not conform to the SPA's requirements,

22   rendering each Certificate of Conformance shipped with each ASM an affirmative

23   misrepresentation.  Thus, by further advocating its ozone theory as the reason for its

24   ASMs' failures, Electroid is either misrepresenting that ozone caused its ASM

25   failures, or it repeatedly misrepresented that its ASMs conformed to the SPA's

26   specifications each time it shipped an ASM to Parker.

27         49.    Even after Electroid privately confirmed that the failures listed in the

28   Root Cause Report were caused by the ASMs' manufacturing defects and the

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

ASMs' inability to meet the SPA's specifications, Electroid continued to profess that it was unable to find a solution to remedy its ASMs' failures.  Meanwhile, customer warranty returns to Parker continued to increase exponentially.

50.     As previously alleged, Electroid was in the best position to evaluate its ASMs' ability to meet the SPA's requirements and withstand the airplane's operating environment, as specified in the SCD.  Moreover, the SCD was not some inflexible pre-defined document whose terms Parker thrust upon Electroid.  Instead, Electroid was involved in reviewing the SCD and could have contributed its superior knowledge of information at any point.  Indeed, Electroid was so well-positioned to evaluate this information that, as mentioned above, the SPA expressly required Electroid to "track and analyze in-service data and correct all design deficiencies to comply with the requirements and intent of the SCD." (Attachment B §12.0(l).)

51.     In other words, if the SCD was incomplete or inaccurate, Electroid was knowledgeable enough to say so when Parker sought to discover the root cause of the ASMs' defects.  But because changing the SCD would not solve the inherent problems with Electroid's defective ASMs – their manufacturing defects and inability to withstand already identified contaminants and environmental factors – Electroid instead obfuscated and concealed data regarding contaminants, jumping from one unsupported theory to another to perpetuate the cover-up of the true cause of its product's failures.

52.     In February 2012, Electroid and MEDAL Air Liquide presented their initial report to Parker that attempted to blame Parker by suggesting that the root cause of Electroid's ASMs' failures was contaminants in the bleed air system, and that Parker had not identified such contaminants in the SPA.  However, at the same time, and without Parker's knowledge, on February 22, 2012, MEDAL Air Liquide employee Karl Beers internally expressed two serious concerns that:

(1) "Honeywell and Boeing will be notified of this issue [with the ASM failures]

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

which will facilitate an initial review of all relevant technical, development, and qualification data and our position is somewhat weak.  IMS, and Electroid were using a shell side fed bundle test data to demonstrate the predicted normal aging and there was never any data run by IMS to show that they will age the same"; and (2) there was "some uncertainty with the method that IMS and Electroid ran their development contamination test before [MEDAL Air Liquide] purchased IMS and that issue will be discovered."

53.     Similarly, in an earlier presentation given on October 17, 2011, MEDAL Air Liquide expressed concerns regarding "████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████" Electroid participated in these ████████████████ contamination tests that failed to account for the thermal cycling that occurred in the operating environment.  In other words, early on, IMS and Electroid failed to perform the proper contamination testing, despite representing to Parker that they had done so in accordance with the SPA's provisions.

54.     Because the ASMs were never properly tested and could not withstand the aircraft operating environment, as the SPA required, they never conformed to the specifications, rendering every Certificate of Conformance Electroid delivered to Parker, which accompanied each ASM shipment and represented compliance with the SPA's requirements, an affirmative misrepresentation.

55.     As demonstrated above, Electroid and IMS knew that certain contaminants would be present in the operating environment, such as acetic acid, but cut corners with their testing protocols.  Electroid never disclosed its knowledge of some of these contaminants, as evidenced by the fact that Electroid was aware of

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

PARKER HANNIFIN CORPORATION'S SECOND AMENDED COUNTERCLAIM

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

1   acetic acid, but never added this contaminant to the SPA's specifications, as it was

2   required to under Section 9.0 of Attachment C to the SPA.

3       56.    With each ASM shipment to Parker, Electroid submitted Certificates

4   of Conformance that certified that "ALL PRODUCTS OR SERVICES

5   DELIVERED ON THIS CONTRACT AND PACKING LIST/SHIPPER ARE IN

6   COMPLIANCE WITH ALL REQUIREMENTS OF THE CONTRACT." Each

7   certificate was signed and dated by a representative from Electroid's Quality

8   Control Department. These certificates were affirmative misrepresentations, in that

9   Electroid knew that the ASMs did not meet the contract specifications, including

10  contamination tolerance specifications and the ability to withstand the operating

11  environment.

12      57.    Rather than admit and acknowledge that the ASMs did not meet the

13  contract specifications regarding contamination tolerance, and rather than admit and

14  acknowledge that there were known manufacturing defects, Electroid covered up

15  these serious flaws, and instead embarked on a disinformation campaign.

16      58.    When Electroid and MEDAL Air Liquide began collaborating to

17  attempt to determine the cause of Electroid's ASMs' failures, Etter warned several

18  MEDAL Air Liquide employees at a meeting, "don't admit anything yet." Etter

19  never missed an opportunity to put his "don't admit" scheme into action. For

20  example, in a June 2012 email where MEDAL Air Liquide's Director of Quality &

21  Aerospace Programs, Ralph Schwendeman ("Schwendeman"), summarized a

22  meeting between MEDAL Air Liquide and Electroid key personnel, Schwendeman

23  observed that when Bruce Friedman ("Friedman"), the Co-Chairman of Valcor's

24  board of directors, joined the meeting, he "did not seem to have a full picture of the

25  technical issues involved. He specifically asked if there were any issues in the

26  structure of the bundle itself. He was told no, which of course is not consistent w/

27  the discussion we had prior to his joining the meeting." But, of course, outside

28

Friedman's presence, the discussion focused on the fact that there were technical issues and issues with the structure of the tube sheet bundle.

### Electroid Deceives Parker as to the True Cause of its
### ASMs' Failures and Destroys Documents in Violation of the SPA

59.     The issues in the structure of the fiber membrane cartridge were major – they were manufacturing defects in the tube sheet, which made the ASMs susceptible to humidity, a known environmental factor in the in-service operating environment.  (Attachment B §6.1.3.2 (requiring humidity testing as part of the ASM qualification).)  Section 4.4.2 of Attachment C to the SPA provided that the ASM "life should be established for average environment as well as for unique environments such as, but not limited to: high humidity, high Ozone concentrations, high sand/dust levels."  But the Electroid ASM could not withstand even average humidity in the Boeing 737 operating environment.  Because Electroid's ASMs had manufacturing defects, the tube sheet would become saturated because of the humidity, causing it to swell.  The swelling caused stress to the tube sheet leaving voids and cracks as the humidity increased and decreased during the thermal cycles of the frequent flights that many of the Boeing 737s were designed to take.  These voids and cracks are the most likely cause of the ASMs' premature failures.

60.     At multiple times during the months before the Corrective Action Plan with Parker was put into place, including in an internal memorandum dated March 30, 2012 written by Karl Beers of MEDAL Air Liquide and notes produced by MEDAL Air Liquide titled "████████████████" dated June 5, 2012, ██████ ████████████████████████████████████████████████ ████████████████████████  The physical signs of degradation on the failed ASMs also led the parties involved in the Corrective Action Plan to question the effect of humidity early on in formulating the Corrective Action Plan.  This prompted MEDAL Air Liquide and Electroid to conduct "swelling" tests, which were presented, in part, to Parker.  However, Etter quickly moved to dispel this

- 18 -

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

theory, in bad faith, by falsely representing in a February 7, 2013 presentation to Parker that humidity was only present 1-2% of the time and thus could not be the cause of the ASMs' failure.

61.     This affirmative misrepresentation prevented Parker from discovering that the ASMs suffered from manufacturing defects and were not built to meet the SPA's specifications.  It also made each Certificate of Conformance provided with each ASM shipment an affirmative misrepresentation.  Electroid's knowledge of its ASMs susceptibility to humidity meant that Electroid knew its ASMs did not conform to the SPA, and therefore, each Certificate of Conformance certifying that each ASM was in compliance was an affirmative misrepresentation.

62.     To make matters worse, unbeknownst to Parker, Electroid had gained considerable insight into the reason for its ASMs' defects through the humidity testing.  But instead of using that testing data to eliminate the defects in the ASMs it was selling to Parker, as alleged above, by at least October 15, 2012 Etter was secretly using the data obtained from the investigation of the humidity's impact on the defective Electroid ASMs to ensure that the Gen2 and Gen3 ASMs that Electroid was developing would not suffer from the same flaws.  In notes memorializing a discussion with Tuan Cao of Boeing dated October 18, 2012 regarding a review of the "progress on humidity swelling test to date," Etter wrote that "[w]e talked about thinning neat epoxy ring to reduce stiffness, reduce radial creep due to humidity swelling, use the best geometry of gen 2 and gen3 – He agrees."  Electroid did not propose the use of its next generation ASMs for the 737 NGS program to Parker until it vaguely did so in February 2014, and Electroid never provided Parker with the technical details behind those next generation ASMs.

63.     These modified ASMs were developed largely from the data Electroid gained from secretly continuing to investigate the defective ASMs that it was selling Parker.  In fact, presentations Electroid made to Parker's competitors

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

33902881

- 19 -

PARKER HANNIFIN CORPORATION'S SECOND AMENDED COUNTERCLAIM

actually included side-by-side comparisons between Electroid's original defective ASMs that it sold to Parker and the Gen2 and Gen3 ASMs it was pitching.  These presentations explicitly acknowledged that Electroid's Gen2 and Gen3 ASMs solved the problems with Electroid's original defective ASMs that it sold to Parker.

64.     On August 26, 2014, Electroid's Wismer and Etter began marketing the Gen2 ASM to Honeywell as "a drop in replacement for the P8 MMA generation 1 unit with no mounting or installation issues."  The P8 MMA is the military version of the Boeing 737 and the "generation 1 unit" referenced was the same unit as the defective one being sold to Parker.  The next day Wismer and Etter marketed to Eaton, one of Parker's competitors, that the "gen 2 design" has "a stronger stress state (compression) than the Generation 1 design, which will reduce or eliminate the tube sheet cracks experienced by gen 1."

65.     These side-by-side comparisons establish that Electroid used the proprietary information and technology it developed with Parker to improve the ASMs' quality and performance.  Indeed, on March 9, 2016, just days before it filed its original complaint against Parker, Electroid employees Jeffrey Drobits, Nathaniel Ching, and Wismer were working on a presentation titled "Fiber Adhesion Program Status Update," wherein they presented a plan to strengthen the epoxy used in the ASMs to increase their durability and ability to withstand various known contaminants in the operating environment, including humidity.  However, the technical details of these modified ASMs, including the fiber adhesion improvements to their epoxy, would remain concealed from Parker.

66.     Instead, the modified ASMs would be marketed directly to Parker's customers and competitors as "improved" ASMs.  In contrast, Etter presented an unsolicited sales pitch of the Gen2 ASM to Parker on February 26, 2014, affirmatively misrepresenting it as a "novel," more expensive, product.  Etter specifically asked that Parker's technical team be excluded from the presentation, yet failed to provide necessary technical details, after being repeatedly asked for

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

those details following the presentation, including through a formal Request for Information.  Accordingly, not only did the concealment of Electroid's investigation of its ASMs' defects, including the humidity data, cause Parker to continue paying for the defective product, but it also allowed Electroid to compete directly with Parker in the marketplace in material breach of the SPA.

67.     Not long after Electroid internally dispelled the peracetic and acetic acid theory, it confirmed that its ASMs were overly susceptible to humidity in the environment and began testing and applying known cures to the humidity problem in the development of its next generation ASMs.  Around this time, Valcor also took a major step in its concealment scheme:  it destroyed an entire server of data containing highly relevant information regarding the SPA, the qualification testing of its ASMs and documents and communications relating to the failed Electroid ASMs.  Valcor did this even though preserving records was so critical that Electroid expressly agreed to preserve "all records that provide objective evidence of compliance to the Contract requirements for a minimum of fifteen (15) years after the last delivery of products and/or service on the Contract," in the Purchase Order Clauses, which was incorporated into the SPA as Exhibit 3 to Attachment D.

68.     Significantly, for nearly three and one-half years, Electroid concealed from Parker the fact that it had destroyed its server.  This concealment even continued well after Valcor filed this lawsuit.  Valcor's counsel concealed this fact during the multiple discussions regarding the establishment of their "Agreed Discovery Protocol."  Likewise, Valcor's counsel concealed this fact during the multiple meet and confer calls Parker initiated regarding the numerous deficiencies in Valcor's document productions.

69.     In the end, Valcor waited until almost a year after it commenced this litigation to disclose its data destruction, burying its confession on the thirty-ninth page of the joint statement regarding Parker's motion to compel Valcor to produce documents.  (Joint Statement (Dkt. 54).)  In its order granting Parker's motion to

Troutman Sanders LLP
5 Park Plaza
Suite 1400
Irvine, CA 92614-2545

1    compel Valcor to produce intentionally withheld documents, the Court found that

2    Valcor's counsel "did not act reasonably under the parties' Agreed Discovery

3    Protocol" as to when they disclosed the server destruction. (May 5, 2017 Order

4    (Dkt. 83) at 9-10.)

5         70.    Some of the most critical work relating to investigating the ASMs'

6    failures was conducted before the October 2013 server destruction date, including

7    research into the defective ASMs' susceptibility to humidity.  The relevance of the

8    missing documents has been confirmed by third-party document productions, which

9    also revealed that not only did Valcor eradicate the documents maintained on the

10   now-destroyed server, it destroyed (or continues to conceal) many other documents

11   beyond those that were on the server.  Valcor did this despite the express

12   contractual provisions requiring it to retain those documents.  It is impossible for

13   Parker to confirm the extensiveness of the destruction or what information it is

14   missing, since no third-party can provide the complete record once held by Valcor.

15        71.    In addition to destroying evidence, to further perpetuate its

16   misdirection relating to the contaminants, Electroid insisted that Parker investigate

17   the filter upstream of the ASMs, even though Electroid knew that any issues

18   associated with the upstream filter could not excuse its ASMs' defects.  The FAC

19   inconsistently asserts that vapor, ozone, peracetic or acetic acid, and hydrocarbons

20   each were the cause of the ASMs' degradation.  However, the upstream filter was

21   not intended to remove any of these contaminants.  As Section 3.2.10.2 of the SCD

22   provided, the filter was expressly designed only to remove some particulates, liquid

23   aerosols, and liquids.  Parker never had information that contaminants beyond those

24   contained in the SPA's specifications were passing through this filter, as Valcor

25   asserts.

26        72.    The concept of additional filtration to remove contaminants had been

27   openly discussed as a potential solution during Corrective Action Plan meetings,

28   despite Valcor's contentions in its FAC that Parker concealed such information.

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

PARKER HANNIFIN CORPORATION'S SECOND AMENDED COUNTERCLAIM

1   Indeed, a report from Etter to the Valcor board of directors explained that Electroid

2   provided ███████████████████████████████████████ to a third-

3   party entity (in violation of the SPA, since Electroid was required to treat such

4   information as confidential and proprietary), which included an enhanced filter as a

5   possible solution.

6        73.     However, this concept would require a re-design of the existing filter

7   to remove the alleged contaminants to which Electroid's ASM was susceptible,

8   since the existing filter was not designed for that purpose.  But to this day, Electroid

9   has never identified a specific contaminant that caused the defect in its ASMs.  Nor

10  could it.  That is because contaminants were not the true cause of Electroid's

11  ASMs' failures.  Thus, there was no culprit contaminant to filter out.  The defects

12  were the result of a faulty design and manufacturing process for which Parker is

13  blameless.

14       74.     Electroid also insisted that the in-service operating environment itself

15  be investigated, when it knew that Parker obviously did not operate the aircraft and

16  thus did not have access to that data.  These tasks were expressly assigned to

17  Boeing and Honeywell in investigating the ASMs' failures.  Indeed, documents

18  produced in this litigation establish that Electroid worked closely with both

19  Honeywell and Boeing in both purporting to investigate its defective ASMs and in

20  secretly developing Gen2 and Gen3.  As Wismer described it in his "Detailed

21  Notes" summarizing a meeting between Electroid, MEDAL and Honeywell on

22  February 2-4, 2016, Electroid found it "encouraging" "that Honeywell intends to

23  get rid of their current supplier (Parker) by the end of 2017."

24       75.     Electroid also took advantage of technical coordination meetings and

25  quarterly program reviews, along with its Corrective Action Plan, to draw attention

26  to alleged causes other than its own product's manufacturing defects, in bad faith,

27  including the bleed air contamination.  Electroid did this to avoid the discovery

28  and/or disclosure of the true cause of Electroid's ASMs' defects.  But as one

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

PARKER HANNIFIN CORPORATION'S SECOND AMENDED COUNTERCLAIM

1    MEDAL Air Liquide employee Uttam Shanbhag wryly observed on February 25,

2    2015: "Where and who has seen these exotic compounds in bleed air remains to be

3    seen."  Moreover, Electroid devoted little time to evaluate off-specification

4    contaminants during the development of its next generation ASMs that it continued

5    to conceal from Parker.  In emails exchanged between Electroid and MEDAL Air

6    Liquide employees during 2015 regarding qualifying the Gen2 and Gen3 ASMs,

7    MEDAL Air Liquide based its testing on complete contaminant lists that Electroid

8    provided.

9        76.    This not only completely refutes any claim that contaminant

10   information was concealed from Electroid, but it establishes just the opposite.

11   Electroid concealed important contaminant information from Parker.  If Electroid

12   truly was unable to resolve the contaminant issue, then it could not qualify the

13   Gen2 and Gen3 ASMs, which simply were improved versions of the defective

14   ASMs Electroid sold to Parker.  Indeed, under the SPA and Corrective Action Plan,

15   these improved versions should have been disclosed to Parker.

16       77.    By January 2014, Electroid and Parker already had begun discussing

17   the possibility of Electroid designing a new air separation module to replace

18   Electroid's current defective ASM.  But consistent with its deceptive conduct

19   described herein, Electroid refused to provide the technical details of that potential

20   new air separation module, purportedly because of Electroid's professed concern

21   that upon receipt of that information, Parker would then eliminate Electroid as the

22   supplier.

23                **Parker's Backup Plan and Decision to Change Suppliers**

24       78.    Still unaware of the fraud that Electroid had perpetrated on it, Parker

25   eventually concluded that transitioning to an entirely new ASM manufacturer was

26   necessary.  Indeed, as early as October 2012, "[b]y any objective standard, the in-

27   service performance of the Electroid/MEDAL ASM on the 737NG [ ] provided

28

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

1  sufficient motivation and latitude for [Parker to] explor[e] other suppliers."  (FAC,

2  Ex. 5.)

3       79.    A slide omitted from Exhibit 9 to Valcor's FAC reveals that in

4  November 2013, Parker acknowledged that a major concern to Parker was that

5  "█████████████████████████████████████████████████████████

6  █████████████████████████████████"  In fact, as this omitted

7  slide deck further reflects, ███████████████████████████████████

8  ████████████████████████████████████████████████████████████

9  ████████████████████████████████████████████████.  A few

10 months later, Parker's internal analysis, ██████████████████████████

11 ████████████████████████████████████████████████████████████

12 ██████████████████████"  Electroid.  (FAC, Ex. 14.)

13      80.    As time went by, the situation only worsened.  Indeed, another internal

14 confidential Parker slide deck attached, in part, to Valcor's FAC explained that in

15 February 2014, "dissatisfaction expressed by the [airplane] operators suggests that:

16 The market is rife with opportunity for a [Parts Manufacture Approval] solution

17 from a competitor" and that "[p]romoting the Electroid ASM over the long term

18 will be unsustainable and the 737NG and 737MAX ASM business will be lost to a

19 competitor."  (FAC, Ex. 11.)

20      81.    Moreover, as reflected in another slide that Valcor chose to omit from

21 a partial slide deck attached to its FAC, by September 2014, Electroid had not met

22 Parker's requirements for on-time delivery performance during most months over

23 the past year, and Parker had "██████████████████████████" due to returned

24 ASMs still under warranty.

25      82.    While Electroid's ASMs' failures were more than any reasonable

26 company could be expected to tolerate, Parker knew that it was not economically or

27 practically feasible to immediately terminate the SPA, even though Electroid had

28 materially breached multiple SPA provisions justifying termination.  Changing

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

1    suppliers is no simple task.  ASMs are unique products that must fit within an entire

2    inerting system, and are subject to strict FAA regulations and approval.  Thus, it

3    would take a substantial amount of time and money to develop and obtain approval

4    for a replacement ASM supplier.

5        83.    However, Parker also was keenly aware that it had to remediate or

6    mitigate the increasingly high cost and significant negative impact resulting from

7    Electroid's ASM failures.  Thus, before making a final decision to find an alternate

8    supplier, Parker worked in earnest with Electroid through their own "Corrective

9    Action Plan" to attempt to determine and resolve the root cause of the increasing

10   number of returns since 2011.  But because there was no guaranty that Electroid

11   could satisfactorily eliminate the problem, as any prudent business would do,

12   Parker also initiated a backup plan to engage a different ASM supplier "[a]s a

13   mitigation action" and "in the event the Electroid/Medal option falls apart."  (FAC,

14   Ex. 4.)  Parker initiated this backup plan as soon as it could.  That is because Parker

15   knew that it could take up to four years to develop a viable replacement (FAC,

16   Ex. 7).

17       84.    Although Valcor pleads ignorance in its FAC that Air Products was the

18   company that would replace Electroid (*see, e.g.,* FAC ¶26), Etter had long

19   expressed his anxiety that Parker would replace Electroid with Air Products as the

20   ASM supplier for the Boeing 737, just as Parker had done in 2008 for the Boeing

21   747 ASMs, due to Electroid's inability to make a quality product that met

22   contractual requirements.

23       85.    On June 1, 2012, MEDAL Air Liquide employee David Marchese

24   recounted in an email chain with the subject "EC [meeting] notes" that, "Steve Etter

25   continues to believe/act that there is a small chance that another membrane supplier

26   ([Air Products]/Parker) could supplant Air Liquide should a corrective action not be

27   forthcoming quickly.  Both Air Liquide and Electroid believe the material balance

28   around the air separation module would be difficult to replicate with the lower

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

1   selectivity Parker fiber.  [Etter] indicated that Air Products could meet the specs

2   based on the fiber performance properties that they have observed in prior programs

3   – Air Liquide agrees with this assessment that Air Products has a fiber that could

4   meet the 737 specifications.  I believe being replaced by [Air Products] is the

5   largest commercial threat outside of any potential pending liabilities."

6        86.    Electroid would do anything to prevent losing another ASM contract

7   to Air Products, including initiating expensive and ill-founded litigation.  As

8   Valcor's Co-Chairman of the board, Bruce Friedman, explained to MEDAL Air

9   Liquide, it was Valcor's practice to defend its products by suing the buyer, asserting

10   that "their product was unable to meet performance requirements due to a poorly

11   defined or incorrect specification."  Valcor has held firmly to this "practice" in this

12   litigation.

13        87.    On October 15, 2015, due to the increasing cost of having to replace

14   and investigate the failing Electroid ASMs, the risk that it could lose 70% of its

15   market share if Electroid remained as ASM supplier, and Electroid's inability to

16   meet Parker's capacity needs, Parker sent a letter notifying Electroid of the ongoing

17   reliability failures relating to its ASMs and demanding it provide adequate

18   assurance of performance under the SPA.

19        88.    Electroid responded on November 24, 2015, but failed to take

20   responsibility for its breaches or provide adequate assurance that it would comply

21   with its obligations under the SPA.

22        89.    Parker sent additional letters to Electroid on January 18, 2016 and

23   April 13, 2016 regarding its non-compliance and material SPA breaches.  However,

24   because Electroid had long ago decided to go down the path of circumventing

25   Parker in the supply chain process, Electroid chose not to take the letters seriously.

26        90.    To date, Parker has received over 3,700 ASMs from aircraft operators,

27   all of which have failed before reaching the required 27,000-hour life.  Of those

28   3,700 ASMs received, over 1,800 have failed within the warranty period, totaling

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

33902881

- 27 -

PARKER HANNIFIN CORPORATION'S SECOND AMENDED COUNTERCLAIM

1    more than $18 million in replacement costs.  On average, these ASMs have

2    accumulated approximately 11,000 flight hours compared to the service interval of

3    27,000 flight hours as the SPA required.

4         91.    With Parker's final notice that it planned to second source the ASMs

5    for the 737 program, Valcor realized that it was time to play its victim "card."  It

6    therefore filed a peremptory strike lawsuit against Parker to deprive Parker of its

7    natural position as the plaintiff in this case.

8         **Electroid Claims in June 2017, for the First Time, that its Failed**

9         **ASMs Could Cause an Airplane Explosion**

10        92.    And now, by and through its modified FAC filed June 21, 2017,

11   Valcor informed Parker, for the first time, of Valcor's contention that Electroid's

12   ASMs' failures could "cause an airplane explosion, property damage, personal

13   injury, and/or death."  (FAC ¶164(A)(iv).)

14        93.    This came as a shock to Parker, who until then, was never informed by

15   Electroid that Electroid's ASMs could cause the catastrophic harm that Valcor now

16   alleges.  It is even more disconcerting that despite believing that Electroid's

17   defective ASMs could cause an airplane to explode, Valcor was willing to risk

18   being responsible for causing such mass casualties because it wanted to generate

19   further profit for itself by continuing to sell its ASMs to Parker.  But to Valcor, this

20   was merely the cost of doing business.  Given such shameless greed, it is not

21   surprising that Valcor never reported this alleged potential danger to the FAA.

22        94.    Valcor's fraudulent conduct was further exacerbated, in that while

23   Electroid secretly and improperly developed technology which improved the ASMs

24   covered by the SPA, Electroid continued to provide Parker with the old defective

25   ASMs that did *not* have the benefit of the improvements Electroid secretly made to

26   those ASMs, which seemingly cured, or at least diminished, the ASMs' defects.

27   Electroid's willingness to continue to supply these old defective ASMs to Parker,

28   and handsomely profit from a product that Electroid knew was defective, while at

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

33902881                              - 28 -

PARKER HANNIFIN CORPORATION'S SECOND AMENDED COUNTERCLAIM

the same time attempting to sell the new and improved ASMs behind Parker's back, made Valcor's admission in its FAC all that more reprehensible.  Valcor never before disclosed this critical information to Parker.

95.   Based on Valcor's FAC's allegations, Valcor's concealment of this alleged threat left Parker unknowingly exposed to liability for personal damages, since Parker is in the ASM supply chain and operated under the good faith belief that, as the Certificates of Conformance provided by Electroid expressly represented, the ASMs complied with all of the SPA's provisions.  Valcor furthered these concealments and misrepresentations by repeatedly asserting in various correspondence with Parker that its ASMs "fully conform with the specifications provided by" Parker, including in a letter from Steve Etter dated November 24, 2015 and its FAC.  (*See, e.g.,* FAC ¶¶ 22, 127.)

96.   Moreover, had Parker known that the ASMs could cause personal injury, as Valcor now claims in its FAC, Parker would not have devoted substantial time, effort and expense to attempt to determine the root cause of the problems which were already known to Electroid.  Instead, Parker would have expedited its transition to another supplier to avoid escalating warranty costs, or would have taken steps to implement a safer, feasible alternative design.

97.   As a result, based on the FAC's allegations, Parker could be exposed to liability for personal damages in a products liability suit, if the plaintiffs in that suit established that the ASMs caused personal injury and that the risks outweigh the design's benefits.

### The SPA's Key Provisions

98.   Under the SPA, Parker agreed to purchase ASMs from Electroid, provided that Electroid satisfied numerous terms and conditions, as well as specified foundation performance commitments concerning technology, quality, lead-time, delivery quantity, price and continuous improvement (the "Foundation").

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

1   The duration of the parties' relationship is expressly "contingent on [Electroid]

2   meeting Parker's expectation of acceptable performance" as set forth in the SPA.

3     99. Electroid's "demonstrated commitment to the Foundation elements" is

4   "an important factor in determining acceptable performance" of Electroid

5   throughout the term of the SPA.  (SPA §1.0.)  Pursuant to the Foundation elements,

6   Electroid contractually committed to:  (1) "Technology: maintain or improve [its]

7   technology, industry position, and competitiveness"; (2) "Quality: meet or exceed

8   [Parker's] quality requirements"; (3) "Lead-time: flexible to support [Parker's]

9   requirements"; (4) "Delivery quantity: flexible to support [Parker's] requirements";

10   (5) "Price: "share the benefit from [Parker and Electroid's] commitment, maintain

11   or improve competitiveness"; and, (6) "Continuous improvement in all of the

12   above: work with [Parker] to reduce cost, improve quality & reliability, increase

13   sales."  (SPA at 1.)

14     100. Under the SPA, Electroid agreed to "work exclusively with Parker and

15   to not share technology, proprietary information, sell its Air Separation Modules

16   (ASM), or otherwise assist any third party with respect to any related original

17   equipment manufacturer, aftermarket or spare parts sales for any ASM modules

18   which is to be used in the Nitrogen Generating System of the Boeing aircraft listed

19   in Attachment B, Item 3.0 of this SPA, for which Parker orders, or by written

20   notice, intends to order ASM modules, whether such module is to be incorporated

21   in an original equipment manufacture assembly or for aftermarket or Supplemental

22   Type Certificate program sales by Parker.  This exclusive agreement shall apply

23   through the life of the program unless terminated."  (SPA §1.0; Attachment B

24   §3.0.)

25     101. Under the SPA, Parker has the right to purchase ASMs from Electroid

26   "[p]rovided that [Electroid] remains in compliance with its contractual obligations,

27   remains competitive with regard to technology, and satisfactorily meets all

28   requirements regarding delivery, quality, lead-time and pricing."  While the SPA

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

included a "goal" in terms of the volume of prospective orders, the parties agreed that the goal was "a forecast only and is subject to change continuously and is not a commitment to buy specified items or quantities." (SPA §2.0; Attachment B §3.0.)

102.   The SPA provides that Electroid "understands that it is expected to deliver only a product which meets [Parker's] quality requirements and all other applicable requirements." (SPA §5.0.)

103.   The parties further agreed that "[i]n the event that a product does not meet [Specification Control Drawing] SCD 2020135 and/or SCD 2030157 is delivered by [Electroid], [Electroid] will replace the defective product at no additional charge to [Parker] and will pay all return and re-shipment expenses." It further states that "replacement shall be accomplished by [Electroid] within 48 hours of receipt of notification of the defect." (SPA §5.0.)

104.   Electroid understood and agreed that "[Parker] expects that [Electroid] will have a commitment to deliver products with zero defects." The parties agreed that initial corrective action reports for defects, including a defect analysis and corrective action plan, would be provided within five working days of a return to Parker. (SPA §5.0.)

105.   Electroid further agreed that it "will make a good faith effort to continuously improve competitiveness and performance in all areas of the relationship, including co-development in the design cycle, quality, release lead time, minimum release quantity and pricing." Electroid was "expected to advance its economies of production and technical prowess at least as fast as other competitors in the industry, maintaining its competitive position and offering the price and performance benefits of those improvements to [Parker]." (SPA §7.0.)

106.   The SPA contains stringent performance requirements for Electroid. Electroid agreed that it "will maintain a performance level of 98% On-time Delivery and 99% Quality acceptance or higher." The SPA provides that if Electroid's "performance rating drop[s] below this threshold, [Electroid] will not be

- 31 -

eligible for the addition of new items …"  Further, Parker "has the right to deduct the costs incurred by [Parker] because of late delivery and/or quality rejection from the corresponding invoice payment …"  (Attachment B §6.0.)

107.   The SPA provides that Electroid shall notify Parker of any circumstances that may cause a delay in delivery and "shall use additional effort, including premium effort, and shall ship via air or other expedited routing to avoid or minimize delay to the maximum extent possible."  Electroid is solely responsible for "such costs attributable to delays caused directly by [Electroid]."  (Attachment B §6.1.)

108.   Under the SPA, Electroid also agreed to institute a "Continuous Improvement Program," under which "[Electroid] will define, establish and maintain databases for collecting production process data.  These databases will be used to support a Continuous Improvement Program.  These databases will track key process parameters to enable analysis, optimization, and control design. [Electroid] and [Parker] will share such data and work together to analyze the data and actively develop improvements."  (Attachment B §8.0.)

109.   All products Electroid delivered were subject to inspection by Parker. The SPA provided that Parker "may reject any Product that does not strictly conform to the requirements of the applicable purchase order."  The SPA further provided that "[a]ll rejected Products will be returned to [Electroid], at [Electroid's] risk and expense for immediate repair, replacement or other correction and redelivery to [Parker]."  (Attachment B §10.0.)

110.   In addition, the SPA incorporated the Non-Disclosure Agreement entered into by Parker and Electroid.  (Attachment B §15.0.)  Specifically, it stated that "[a]ll written and verbal communication relating to the NGS Program shall be considered as proprietary and subject to the terms and conditions of the 'Non-Disclosure Agreement'."  (Attachment B §15.0.)

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

111.   Electroid was required to submit to Parker for approval all changes to the ASM design.  The SPA provided that "[o]nce a drawing has been approved and released by [Parker], [Electroid] shall not make any design change affecting form, fit, function, weight, reliability, safety, performance or interchangeability of the end item assembly without prior written approval from [Parker]."  (Attachment B §11.2.)  These same requirements are also detailed in Parker's Quality Assurance Purchase Order Clauses for Parker Aerospace Suppliers ("Purchase Order Clauses"), which were incorporated into the SPA as Exhibit 3 to Attachment D.

112.   Electroid also agreed to "give Parker written notice before relocating any production, inspection or processing facilities; or, transferring work between different facilities; or, when applicable, prior to initiating any changes in the source of major components procured by [Electroid] and designated for use in or for installation of products scheduled for delivery to Parker; or, making any other changes which may affect product quality, reliability, or integrity.  Such changes are subject to approval/disapproval by Parker."  (Exhibit 3 to Attachment D §3.3.1.)

113.   Electroid also agreed that it could "not make any changes or substitutions to any products or services required by the Contract, drawing, specification, standard, or other applicable documents without prior written authorization by Parker."  (Exhibit 3 to Attachment D §3.3.3.)

114.   The SPA outlined Electroid's program responsibilities.  Under Electroid's program responsibilities, Electroid was required to "[s]upport [Parker] and [Parker's] customer management meetings, program status reviews and technical coordination meetings (TCM's)" (Attachment B §12.0(e)) and "track and analyze in-service data and correct all design deficiencies to comply with the requirements and intent of the SCD" (Attachment B §12.0(l)).

115.   The SPA included a warranty that all products shall be bound by the terms and conditions noted under Parker Hannifin Corporation Terms and Conditions of Purchase – Commercial (TCP Rev. 1/04) in addition to the following

- 33 -

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

1   provisions: (a) a warranty period of 48 months from date of acceptance of product;

2   and (b) that Electroid shall guarantee a ten working day repair turn-around time

3   (TAT) for in-warranty and out-of-warranty repairs.  (Attachment B §16.0.)

4       116.   The SPA contains robust specifications and quality requirements set

5   forth in Attachment C.  Attachment C, §3.0, Seller Responsibilities, provides that

6   Electroid "is responsible for the design, analysis, definition and integration support

7   of Supplier's products into all variants of Boeing commercial aircraft (7XX

8   series)."  It further states that Electroid's "products shall perform in accordance

9   with and meet the intent of specifications and requirements identified in

10  [Electroid's] SCD [Specification Control Drawing]."

11      117.   Attachment C, §4.1.3, ASM Performance, requires that the ASMs shall

12  meet the following performance requirements: MTBF [mean time between failures]

13  87,000 hours, MTBUR [mean time between unscheduled removal] 87,000 hours

14  and Service Interval 27,000 hours.

15      118.   Attachment C, §8.2, Seller's Responsibilities, requires that Electroid

16  "verify that its design meets the SCD."

17      119.   Attachment C, §9.0, SCD Changes, states that it is Electroid's

18  "responsibility to notify [Parker] in writing whenever there is an indication that the

19  design does not comply with the requirements or intent of the SCD or any other

20  applicable document defined by [Parker]."  This section also requires that Electroid

21  obtain approval prior to incorporating certain changes, including "[p]rocesses after

22  construction of the qualification test article(s)" and "[m]aterials, components, or

23  finishes of the procured article."

24      120.   Attachment C, §15.0, Quality Requirements, provides that "[a]ll items

25  supplied by [Electroid] hereunder shall conform to quality requirements as defined

26  by [Parker] in Quality Assurance Purchase Order Clauses for Parker Aerospace

27  Suppliers Buyer Form P9112 Rev. "A" … Performance shall be maintained at 99%

28  or higher."

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

121.   Parker's Terms & Conditions of Purchase – Commercial (TCP Rev. 1/04), as revised 4/27/04 (the "Terms and Conditions of Purchase"), are incorporated into the SPA, as set forth in Attachment B §16.0 and Attachment D §1.1 to the SPA.

122.   Under the Terms and Conditions of Purchase, if Electroid's delivery of the purchased goods or services is not made in the quantities and at the times specified therein, then Parker "reserves the right without liability and in addition to any other rights and remedies, to cancel the purchase order and to procure substitute goods or services and charge [Electroid] with any direct loss up to a maximum of $200,000.00 of substantiated cost."  (Terms and Conditions of Purchase §5.)

123.   Under the Terms and Conditions of Purchase, Parker "reserves the right to inspect all goods purchased hereunder at [Parker's] discretion and at [Parker's] option and to reject nonconforming goods or services or revoke acceptance of non-conforming goods or services.  At [Parker's] option and at [Electroid's] risk and expense, [Parker] may return non-conforming goods to [Electroid], require [Electroid] to grant a full refund or credit to [Parker] for non-conforming goods, hold non-conforming goods for disposition by [Electroid] or rework non-conforming goods to detect and correct nonconformities."  In the event of multiple nonconforming goods or services, Electroid shall, within 20 days from notice thereof by Parker, submit a written corrective action report to Parker which "shall identify the root cause of nonconformance, identity of affected goods and services, and a corrective action plan, for [Parker's] review and approval."  (Terms and Conditions of Purchase §7.)

124.   Under the Terms and Conditions of Purchase, Electroid "warrants that all goods and services provided hereunder will conform to [Parker's] instructions, specifications, drawings and data …"  Electroid "further warrants that the goods and services furnished … shall conform to all representations, affirmations, promises, descriptions made by [Electroid] in writing."  Electroid "further warrants

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

1   that all services performed for or on behalf of [Parker] will be performed in a

2   competent, workmanlike manner, and shall be free from faults and defects."

3   (Terms and Conditions of Purchase §8.)

4        125.   In addition, the Terms and Conditions of Purchase state that Parker

5   "may cancel this purchase order and [Electroid's] performance hereunder

6   immediately without incurring liability" to Electroid "upon thirty days written

7   notice to [Electroid] in the event of [Electroid's] breach of contract or failure to

8   perform."  (Terms and Conditions of Purchase §17.)

9        126.   The Terms and Conditions were further revised in April 2012 and

10  incorporated into the SPA under Amendment #3 (the "April 2012 Terms and

11  Conditions of Purchase").  The April 2012 Terms and Conditions of Purchase

12  include the same or similar delivery, inspection, rejection, revocation, warranty and

13  cancellation rights as set forth in the original Terms and Conditions of Purchase, as

14  described above.  (April 2012 Terms and Conditions of Purchase §§5, 7, 8, 17.)

15       127.   Under the Purchase Order Clauses, Electroid agreed that it would

16  "maintain all records that provide objective evidence of compliance to the Contract

17  requirements for a minimum of fifteen (15) years after the last delivery of products

18  and/or services on the Contract ... Prior to discarding, transferring to another

19  facility, or destruction of such records, [Electroid] shall notify Parker in writing and

20  allow Parker the opportunity to gain possession of such records including

21  applicable records at [Electroid's] sub-tier sources."  (Exhibit 3 to Attachment D

22  §3.6.)

23       128.   Under Amendment #1 to the SPA, Electroid agreed to carry two

24  months of finished goods safety stock and have their supplier, MEDAL Air

25  Liquide, carry one month of safety stock.  (Amendment #1 §6.)

26       129.   Under Amendment #3 to the SPA, the parties referenced and

27  incorporated the Quality Requirement per Document No. P9112, Rev. D, Drawing

28

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

2030157 at rev. H and DCS [Design Control Specification] 2030157 at rev. A. (Amendment #3 §4-5.)

130.   DCS2030157 covers the design, fabrication, performance, qualification, and functional testing requirements for the ASMs for use on the Nitrogen Generation System for the Boeing commercial airplanes.

131.   DCS2030157 §3.1.4.2, Service Life Requirements, states: "All details of the Equipment *shall* be designed to have a minimum 2X service life.  One service life of the equipment is the equivalent of 75,000 airplane flight cycles and 112,500 flight hours for 20 years of service with the exception of the ASM fiber cartridge, which *shall* meet the requirements of 27,000 flight hours."  (Emphasis in the original.)  It further provides that "[t]he ASM fiber cartridge when exposed to one service life of 27,000 flight hours shall be designed to withstand one life of the contamination levels specified in 3.2.10.1 with a specified loss of NEA flow and purity that represents end of life performance."  It further provides that "[t]he ASM fiber cartridge *shall* be designed for structural integrity to withstand two service lives of pressure/temperature endurance cycles specified in Figure 3.1.4.2-1."  (Emphasis in the original.)  It further provides that "[t]he ASM housing/canister shall be designed to withstand two service lives of pressure/temperature endurance cycles specified in Figure 3.1.4.2-1."

132.   DCS2030157 §3.2.8.1, Performance, states: "The ASM *shall* provide the required NEA flow rate without exceeding the specified oxygen concentration or having a pressure drop less than the minimum specified at Beginning of Life (BOL) and End of Life (EOL) performance specified in 2DCS2030157."  (Emphasis in the original.)  It further provides that "[a]t BOL, the ASM shall not exceed the maximum inlet flow and NEA $O_2$ concentration nor shall it have a pressure drop less than the minimum for each inlet pressure, OEA pressure and NEA flow rate combination specified in 2DCS2030157."  It further provides that "[t]he ASM *shall* meet the performance requirements of paragraph 3.2.8.1 with

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

maximum losses or normalized $O_2$ performance and normalized N2 permeance of 15% each during the 27,000-flight hour service life due to normal aging and impact of contaminants defined in paragraph 3.2.10.2." (Emphasis in the original.)

133. DCS2030157 §3.2.8.1.2, Temperature, provides that the equipment "*shall* perform as specified herein" when subjected to certain temperatures, including operating temperature of +190ºF ± 20ºF, ambient temperature of -65ºF to 200ºF, storage temperature of -40ºF to +180ºF, and transient temperature of +220ºF for) 0.5 minute exposure. (Emphasis in the original.)

134. DCS2030157 §3.2.8.4.2, Transient Response, states that "[t]he equipment *shall* be designed to operate with the bleed air pressure and temperature transient inputs" as specified therein. (Emphasis in the original.)

135. DCS2030157 §3.2.10.1, Design Pressures, states that "[t]he equipment *shall* meet the proof and burst pressures and temperatures detailed in table 3.2.10.1-1." (Emphasis in the original.)

136. DCS2030157 §3.2.10.2, Bleed Air Contamination, states that "[t]he equipment *shall* be resistant to and tolerant of the specified contaminants" and "shall provide the performance specified at end of life per Table 3.2.8.1-2 after exposure to contaminant levels and exposure periods specified herein." (Emphasis in the original.) Specifically, it provides that "[a] coalescing HEPA filter will be placed upstream of the equipment to eliminate particulates and liquids/liquid aerosols. However, gasses and vapors, including decomposition products of liquids, will be present in the equipment inlet flow. The equipment *shall* be designed to tolerate exposure to the contaminants and limits defined." It further provides that "[c]ondensation of the contaminant vapors, including water, will be present on the duct surfaces downstream of the HEPA filter resulting from system cool down following each flight and during overnight parking. The quantity of condensation will be 20 cc's for each system shut down and will be related to the total duct volume between the filter and the equipment. The equipment *shall* be

capable of withstanding the ingestion of the condensed contaminant vapors over the

service life."  (Emphasis in the original.)

137.   DCS2030157 also contains a series of quality assurance provisions.

§4.1 provides that "[t]he equipment *shall* be subjected to verification in accordance

with this section to demonstrate compliance with the requirements of this DCS.

Parker reserves the right to require any additional verification deemed necessary to

determine compliance with the requirements of the DCS."  (Emphasis in the

original.)  It further states that "[c]ompliance with all requirements contained in

Section 3 of this DCS *shall* be verified by one or more" specified methods.

(Emphasis in the original.)

138.   As alleged above and detailed in the First Counterclaim below, Valcor

has breached each of the above listed provisions in the SPA.

## **First Counterclaim**

### **(Breach of Contract)**

139.   Parker realleges and incorporates paragraphs 1 through 138 as if set

forth in full herein.

140.   Parker and Valcor entered into the SPA – a valid, written contract.

141.   Parker has performed all conditions, covenants and promises required

on its part to be performed in accordance with the terms and conditions of the SPA,

or has been excused from performance by Valcor's breaches of the SPA.

142.   Valcor, through its Electroid division, materially breached its

obligations under the SPA including the provisions referenced below.

143.   Valcor breached SPA §1.0 by failing to meet Parker's expectation of

acceptable performance.

144.   Valcor breached SPA §1.0 by sharing technology and proprietary

information regarding its ASMs with third-parties.  Specifically, Valcor assisted

certain customers and competitors of Parker with original equipment manufacturer,

aftermarket and/or spare parts sales for ASM modules to be used in the NGS of Boeing aircraft, including Boeing 737 aircraft.

145.   Valcor breached SPA §2.0 by failing to remain in compliance with its contractual obligations, remain competitive with regard to technology, and satisfactorily meet all requirements regarding delivery, quality, lead-time and pricing.

146.   Valcor breached SPA §5.0 by failing to deliver only a product which meets Parker's quality requirements and all other applicable requirements.

147.   Valcor also breached SPA §5.0 by failing to meet the specifications in SCD 2020135 and/or SCD 2030157, failing to replace the defective product at no additional charge to Parker, failing to pay all return and re-shipment expenses, and failing to do so within 48 hours of receipt of notification of the defects.

148.   Valcor also breached SPA §5.0 by failing to deliver products with zero defects, and by failing to provide corrective action reports for defects within five working days of a return to Parker.

149.   Valcor breached SPA §7.0 by failing to make a good faith effort to continuously improve competitiveness and performance in all areas of the relationship including co-development in the design cycle, quality, release lead time, minimum release quantity and pricing.  Valcor failed to advance its economies of production and technical prowess at least as fast as other competitors in the industry, failed to maintain its competitive position and failed to offer the price and performance benefits of those improvements to Parker.

150.   Valcor breached Attachment B §6.0 by failing to maintain a performance level of 98% On-time Delivery and 99% Quality acceptance or higher.

151.   Valcor breached Attachment B §6.1, by failing to notify Parker of any circumstances that may cause a delay in delivery and by failing to use additional effort, including premium effort, to avoid or minimize delay to the maximum extent possible.

152.   Valcor breached Attachment B §8.0 by failing to analyze developmental, manufacturing and in-service data supported by the comprehensive database required by the SPA.

153.   Valcor also breached Attachment B §8.0 by failing to work with Parker to analyze the data and actively develop improvements for the ASMs.

154.   Valcor breached Attachment B §10.0 by failing to immediately repair, replace or correct defective products and redeliver to Parker.

155.   Valcor breached Attachment B §11.2 by making design changes affecting form, fit, function, weight reliability, safety, performance or interchangeability of the ASMs without prior written approval from Parker.

156.   Valcor breached Attachment B §12.0(e) by failing to support Parker and Parker's customer management meetings, program status reviews and technical coordination meetings.

157.   Valcor breached Attachment B §12.0(l) by failing to track and analyze in-service data and correct all design deficiencies to comply with the requirements of the SCD.

158.   Valcor breached Attachment B §15.0 by disclosing proprietary information that is subject to the terms and conditions of the "Non-Disclosure Agreement."

159.   Valcor breached the warranty provisions of Attachment B §16.0 by failing to honor the warranty period of 48 months from date of acceptance of products and by failing to guarantee a ten working day repair turn-around time for in-warranty and out-of-warranty repairs.

160.   Valcor breached Attachment C §3.0 by failing to deliver products that perform in accordance with and meet the intent of specifications and requirements identified in the SCD.

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

PARKER HANNIFIN CORPORATION'S SECOND AMENDED COUNTERCLAIM

161.   Valcor breached Attachment C §4.1.3, because Electroid's ASMs fail to meet the performance requirements stated therein including MTBF 87,000 hours, MTBUR 87,000 hours and Service Interval 27,000 hours.

162.   Valcor breached Attachment C §8.2 by failing to verify that its design met the SCD.

163.   Valcor breached Attachment C §9.0 by failing to notify Parker "in writing whenever there is an indication that the design does not comply with the requirements or intent of the SCD or any other applicable document defined by" Parker.

164.   Valcor also breached Attachment C §9.0 by failing to obtain Parker's approval for various changes it made, which specifically required approval under this provision, including "[p]rocesses after construction of the qualification test article(s)" and "[m]aterials, components, or finishes of the procured article."

165.   Valcor breached Attachment C §15.0, because the items supplied by Electroid did not conform to quality requirements as defined by Parker in Quality Assurance Purchase Order Clauses for Parker Aerospace Suppliers Buyer Form P9112 Rev. "A" including performance maintained "at 99% or higher."

166.   Valcor breached Parker's Terms & Conditions of Purchase §5 by denying Parker's right to cancel the purchase orders and to procure substitute goods, and by failing to reimburse Parker for its direct losses.

167.   Valcor breached Parker's Terms & Conditions of Purchase §7 by failing to grant a full refund or credit to Parker for non-conforming goods, hold non-conforming goods for disposition or rework non-conforming goods to detect and correct nonconformities.

168.   Valcor also breached Parker's Terms & Conditions of Purchase §7 by failing, within 20 days from notice of multiple nonconforming goods or services, to submit a written corrective action report to Parker which identified the root cause of

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

1   nonconformance, the identity of affected goods and services, and a corrective action

2   plan, for Parker's review and approval.

3       169.   Valcor breached Parker's Terms & Conditions of Purchase §8 by

4   failing to deliver goods that conform to Parker's instructions, specifications,

5   drawings and data and that are free from defective materials or workmanship.

6       170.   Valcor also breached Parker's Terms & Conditions of Purchase §8 by

7   failing to deliver goods that conform to all representations, affirmations, promises

8   and descriptions made by Electroid.

9       171.   Valcor also breached Parker's Terms & Conditions of Purchase §8 by

10   failing to deliver goods in a competent, workmanlike manner, free from faults and

11   defects.

12       172.   Valcor also breached Parker's Terms & Conditions of Purchase §8 by

13   failing to disclose that its ASMs could cause "a fuel tank [ ] to combust and/or

14   cause an airplane to explode or crash, and [ ] disciplinary action by the FAA."

15       173.   Valcor breached Purchase Order Clause §3.3.1 by failing to obtain

16   Parker's approval before relocating any production, inspection or processing

17   facilities; and/or, transferring work between different facilities; and/or, making

18   changes in the source of major components procured by Electroid or its suppliers

19   and designated for use in or for installation on the ASMs scheduled for delivery to

20   Parker.

21       174.   Valcor also breached Purchase Order Clause §3.3.1 by making

22   changes to the ASMs without Parker's approval, which affected the product quality,

23   reliability or integrity of the product.

24       175.   Valcor breached Purchase Order Clause §3.3.3 by making

25   unauthorized changes or substitutions in manufacturing the ASMs it sold to Parker

26   by changing or substituting those ASMs' drawing, specification, standard and/or

27   other applicable documents without Parker's prior written authorization.

28

PARKER HANNIFIN CORPORATION'S SECOND AMENDED COUNTERCLAIM

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

176.   Valcor breached Purchase Order Clause §3.6 by failing to maintain all records that provide objective evidence of compliance to the SPA requirements for a minimum of fifteen years after the last delivery of the ASMs required by the SPA.

177.   Valcor also breached Purchase Order Clause §3.6 by failing to notify Parker in writing that it was going to destroy documents required to be preserved under this provision, and by not allowing Parker the opportunity to gain possession of such records before destroying them.

178.   Valcor breached Amendment #1 by failing to carry two months of finished goods safety stock and have its supplier, MEDAL Air Liquide, carry one month of safety stock.

179.   Valcor breached the SPA by failing to meet the specifications set forth in DCS2030157 including §3.1.4.2 (Service Life Requirements), §3.2.8.1 (Performance), §3.2.8.1.2 (Temperature), §3.2.8.4.2, (Transient Response), §3.2.10.1 (Design Pressures), §3.2.10.2 (Bleed Air Contamination), and the quality assurance provisions in §4.1.

180.   As a direct and proximate result of Valcor's breaches, Parker has been damaged in an amount to be proven at trial, but believed to be in excess of $280,000,000.

## Second Counterclaim

### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

181.   Parker realleges and incorporates paragraphs 1 through 180 as if set forth in full herein.

182.   Parker and Valcor entered into the SPA – a valid, written contract.

183.   Parker has performed all conditions, covenants and promises required on its part to be performed in accordance with the terms and conditions of the SPA, or has been excused from performance by Valcor's breaches of the SPA through its Electroid division.

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

184.   The purpose of the SPA was to facilitate Parker's purchase of quality ASMs from Electroid that it could use to support the NGS Program for Honeywell and/or Boeing airplanes.

185.   Some of the benefits that Parker was to receive under the SPA, in addition to the quality ASMs (SPA §5.0), included Electroid's continuous technological improvements to the ASMs (SPA §7.0) and successful corrective action if the ASMs were not performing according to the SPA's requirements (SPA §5.0).

186.   Electroid, in bad faith, deprived Parker of these benefits by failing to disclose to Parker information concerning Electroid's defective ASMs and thereafter implemented a strategy to delay Parker from discovering the true nature of the defects in its ASMs, including defects in the tube sheet and epoxy.

187.   Electroid perpetuated this delay strategy by failing to investigate and report to Parker information concerning the defects in its ASMs, instead blaming, in bad faith, the ASMs' failures on contaminants in the in-service operating environment, among other things.

188.   Electroid knew that its ASMs would continue to fail, irrespective of the alleged presence of contaminants in the in-service operating environment, but, in bad faith, utilized the alleged presence of contaminants to delay discovery of the nature of the defects in its ASMs and to continue to profit from the sales of its defective product to Parker.

189.   Parker spent years working with Electroid to attempt to discover a solution to Electroid's ASMs' failures while, unbeknownst to Parker, Electroid, in bad faith, was actively delaying the investigation as to the true reason for its product's failure.  Electroid's bad faith delay strategy deprived Parker of its right to quality ASMs, continuous improvements to those ASMs and corrective action under the SPA.

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

190.   Also, unbeknownst to Parker, Electroid devoted considerable time, effort and resources toward developing and marketing its next generation ASMs, Gen2 and Gen3, which were largely based on improvements to the existing defective ASMs that it continued to sell to Parker.  Electroid secretly marketed its next generation ASMs directly to Parker's customers and competitors.

191.   Electroid deprived Parker of the benefits of the SPA by not devoting the time, effort and resources necessary to ensure that it was providing a quality product to Parker.  Instead, Electroid devoted much of its time to developing and marketing an improved ASM product directly to Parker's competitors and customers.  Electroid's bad faith conduct deprived Parker of quality ASMs, continuous improvement of those ASMs and corrective action for which Parker had contracted.  These bad faith acts included:

A.   Concealed technical data from Parker while sharing this data with Parker's competitors and customers so that Electroid could replace Parker;

B.   Concealed from Parker that its ASMs' reliability could not be improved without improving the tube sheet while simultaneously: (a) refusing to improve its own defective ASMs; but (b) working with MEDAL Air Liquide on an improved tube sheet for the Gen2 and Gen3 ASMs;

C.   Negotiated economically unfavorable terms to Parker in Amendment #3 when Electroid had already decided that it would not share its Gen2 and Gen3 technology with Parker and would instead attempt to reduce Parker's share of the marketplace;

D.   Intentionally allowed the number of ASM returns to increase exponentially while: (1) profiting from selling Parker its current defective and refurbished ASMs to replace those that had already failed and been returned to Parker under its warranty program; and (2) concealing the fact that its ASMs "increase[ed] the risk of flammability in Boeing 737 aircraft fuel tanks, which could cause an airplane explosion, property damage, personal injury, and/or death."

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

- 46 -

192.   As a direct and proximate result of Valcor's bad faith conduct in breach of the implied covenant of good faith and fair dealing, Parker has been damaged in an amount to be proven at trial but believed to be in excess of $280,000,000.

### Third Counterclaim

### (Fraud)

193.   Parker realleges and incorporates paragraphs 1 through 192 as if set forth in full herein.

194.   In moving to amend its complaint, Valcor recently informed Parker, for the first time, that Electroid's ASMs could potentially cause a fuel tank to combust and/or cause an airplane to explode or crash, and exposed it to disciplinary action by the FAA.  Valcor, through Electroid, was the only party to the SPA in possession of this material information, but intentionally concealed it from Parker to continue to profit from the sale of its defective ASMs to Parker.  Valcor also failed to disclose to the FAA its belief as to the existence of these potential cataclysmic dangers.  Parker was unaware of this material information when it continued to purchase ASMs from Electroid for years, even after the original complaint was filed in this action.  By deceiving Parker into continuing to purchase its defective ASMs, Valcor exposed Parker to liability for personal damages, since Parker undoubtedly is in the stream of commerce for Electroid's defective ASM product.

195.   Electroid was required to perform a variety of tests on its ASMs under the SPA and as part of the qualification requirements prior to production.  Valcor, through Electroid, was the only party in possession of the material facts relating to the testing it performed, the quality of that testing, and the results of that testing.  As detailed above in paragraphs 20 through 23 and 47 through 58, Valcor knowingly did not perform proper contamination testing prior to the qualification of its ASMs.  Valcor, through Electroid, was the only party to the transaction with

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

1  knowledge of this material fact, thus, Valcor had a legal duty to disclose this
2  material fact to Parker.

3      196.   Valcor intentionally concealed this information from Parker with the
4  intent to deceive Parker into procuring ASMs from Electroid.  As detailed in
5  paragraphs 20 through 23, 34 through 77 and 95, Valcor also made affirmative
6  misrepresentations to Parker that Valcor had complied with the testing and
7  qualification process.  As explained above in paragraphs 21, 22 and 43, these
8  misrepresentations included presentations made by Valcor to Parker that
9  demonstrated that the testing it performed was accurate and sufficient to qualify its
10  product for production.

11      197.   Valcor intended to deceive Parker into continuing to purchase its
12  ASMs, which Parker did not know were defective.  Parker innocently and in good
13  faith relied on Valcor's affirmative misrepresentations and deception and was
14  harmed when the ASMs began failing, which exposed Parker to liability for
15  personal damages.

16      198.   As detailed above in paragraphs 24 through 33 and 59 through 66,
17  Valcor also knew that there were manufacturing defects in its ASMs.  Valcor knew
18  this prior to agreeing to undertake a corrective action investigation with Parker.
19  Valcor, through Electroid, was the only party to the transaction in possession of the
20  material facts relating to the cause of its products' defectiveness.

21      199.   Valcor concealed this information from Parker, despite its legal duty to
22  disclose this information to Parker.  Valcor intended to deceive Parker into
23  continuing to purchase the Electroid ASMs, which, at the time, Parker did not know
24  were defective.  Parker relied on Valcor's deception, including, as detailed in
25  paragraphs 38 through 58, Valcor's affirmative misrepresentations made in the
26  Certificates of Conformance and in correspondence Electroid sent to Parker
27  asserting that its ASMs conformed with the SPA.  Parker was harmed when the
28  ASMs began failing, which exposed Parker to liability for personal damages.

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

200.   As detailed in paragraphs 24 through 67, Valcor knew that the manufacturing and design defects resulted in its ASMs being overly susceptible to humidity.  Valcor, through Electroid, was the only party to the transaction in possession of this material information.  Valcor had an affirmative legal duty to disclose this material information.  Instead, Valcor misrepresented the significance of the impact of humidity in a presentation to Parker and misrepresented to Parker that susceptibility to humidity could not have caused the ASMs to fail.

201.   Valcor intended to deceive Parker by concealing the fact that its ASMs were defective, to continue to profit from the sale of its defective ASMs to Parker.  Parker reasonably relied on Valcor's affirmative misrepresentations concerning the impact of humidity, including, as detailed in paragraphs 38 through 58, Valcor's affirmative misrepresentations made in the Certificates of Conformance and in correspondence Electroid sent to Parker asserting that its ASMs conformed with the SPA.  As detailed in paragraphs 24 through 67, Parker also did not know about the material facts that Valcor concealed regarding the impact of humidity on the ASMs' defects.  Parker was harmed when the ASMs began failing, which exposed Parker to liability for personal damages.

202.   As detailed in paragraphs 38 through 58 above, Valcor knew that contaminants in excess of the specifications were not the cause of its ASMs' failures.  Valcor, through Electroid, was the only party to the transaction in possession of this material information.  Valcor had a duty to disclose these material facts, but chose to conceal them from Parker.  Valcor made numerous affirmative misrepresentations by pressing for contamination testing and continuing to blame excessive contaminants, even though it knew that the contaminants were not the cause of its ASMs' failures.  Valcor intended to deceive Parker by concealing the fact that its ASMs were defective to continue to profit from the sale of its defective ASMs to Parker.  Parker relied on Valcor's deception, including, as detailed in paragraphs 38 through 58, Valcor's affirmative misrepresentations made

1   in the Certificates of Conformance and correspondence Electroid sent to Parker

2   asserting that its ASMs conformed with the SPA.  Parker was harmed when the

3   ASMs began failing, which exposed Parker to liability for personal damages.

4        203.   As detailed in paragraphs 5 through 7 and 63 through 66, Valcor also

5   failed to disclose that it believed it discovered a cure to its ASMs' defects.  Valcor,

6   through Electroid, was the only party to the transaction in possession of this

7   information.  Valcor had a legal duty to disclose this information to Parker.  Rather

8   than disclose it to Parker, Valcor used this information to develop its next

9   generation ASMs, Gen2 and Gen3, which it also concealed from Parker.  Valcor

10   intended to deceive Parker by concealing the fact that it knew why its ASMs were

11   defective, to continue to profit from the sale of its defective ASMs to Parker.

12   Valcor continued to provide Parker with the old defective ASMs that did not have

13   the benefit of the improvements Valcor made to those ASMs, which seemingly

14   cured the ASMs' defects.  Parker reasonably relied on Valcor's affirmative

15   misrepresentations, including Valcor's affirmative misrepresentations made in the

16   Certificates of Conformance and correspondence Electroid sent to Parker asserting

17   that its ASMs conformed with the SPA.  Parker was harmed when the ASMs began

18   failing, which exposed Parker to liability for personal damages.

19        204.   As detailed in paragraphs 38 through 58, with every shipment of

20   ASMs to Parker, Valcor, through Electroid, provided a Certificate of Conformance,

21   which certified "THAT ALL PRODUCTS OR SERVICE DELIVERED ON THIS

22   CONTRACT AND PACKING LIST/SHIPPER ARE IN COMPLIANCE WITH

23   ALL REQUIREMENTS OF THE CONTRACT."  Each of these Certificates of

24   Conformance was an affirmative misrepresentation, because Valcor knew that its

25   ASMs were never properly tested to ensure that they complied with the SPA's

26   specifications, and knew that its ASMs were defective and did not conform to the

27   requirements of the SPA.  Valcor intended to deceive Parker by concealing the fact

28   that its ASMs were defective, to continue to profit from the sale of those defective

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

ASMs to Parker.  Parker reasonably relied on the Certificates of Conformance submitted with each ASM shipment.  Parker was harmed when the ASMs began failing, which exposed Parker to liability for personal damages.

205.   But for Valcor's concealments and affirmative misrepresentations, Parker would not have continued to purchase the dangerous ASMs from Valcor, which exposed Parker to liability for personal damages.  Valcor's concealments and affirmative misrepresentations also made it impossible for Parker to evaluate and implement a safer, feasible alternative design, or to expedite replacing Valcor with a supplier who could provide safe and quality ASMs.  Accordingly, Parker was harmed by Valcor's intentional and deliberate fraudulent conduct in an amount to be determined at trial but believed to be in excess of $280,000,000.

206.   Valcor, through Electroid, acted despicably, willfully, maliciously, oppressively, with full knowledge of the adverse effect of its actions against Parker and with willful and deliberate disregard of the consequences to Parker.  As a direct result of the fraudulent, willful and malicious conduct of Valcor, through Electroid, Parker is entitled to exemplary and punitive damages against Valcor in an amount to be determined at trial but believed to be in excess of $750,000,000.

## Fourth Counterclaim

### (Unlawful and Unfair Business Acts and Practices in Violation of Cal. Bus. & Prof. Code §17200, *et seq*.)

207.   Parker realleges and incorporates paragraphs 1 through 206 as if set forth in full herein.

208.   Valcor's scheme to conceal and mislead Parker from discovering the reasons why its ASMs were defective constitutes an unlawful and unfair business act under California Business and Professions Code §17200, *et seq.* (the "UCL").

209.   14 C.F.R. §3.5 prohibits any person from making or causing to be made, "[w]hen conveying information related to an advertisement or sales transaction," "[a]ny fraudulent or intentionally false statement in any record about

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

- 51 -

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

1   the airworthiness of a type-certificated product, or the acceptability of any product,

2   part, appliance, or material for installation on a type-certificated product."

3       210.   Valcor, through Electroid unlawfully concealed the fact that its

4   defective ASMs "increase[ed] the risk of flammability in Boeing 737 aircraft fuel

5   tanks, which could cause an airplane explosion, property damage, personal injury,

6   and/or death" until it amended its complaint in this action.  Accordingly, Valcor

7   never disclosed this information to Parker or the FAA, despite purportedly having

8   this knowledge since at least 2011, when Parker's customers returned Electroid's

9   defective ASMs due to their failures.

10      211.   By failing to disclose that Electroid's ASMs "increase[ed] the risk of

11  flammability in Boeing 737 aircraft fuel tanks, which could cause an airplane

12  explosion, property damage, personal injury, and/or death," while continuing to

13  submit Certificates of Conformity with each sale transaction, Valcor violated

14  14 C.F.R. §3.5.

15      212.   As a direct and proximate result of its unlawful conduct, Valcor

16  improperly obtained payments from Parker, which unknowingly continued to

17  purchase the dangerous and defective ASMs from Electroid.  Parker also

18  unknowingly and unnecessarily spent significant time, money and resources to

19  investigate the ASM failures.  Parker would not have undertaken such measures had

20  it known that Electroid's ASMs were suffering from dangerous defects that were

21  known only to Valcor, through Electroid, and which resulted from Valcor's

22  defective manufacturing and failure to make a product that complied with the

23  specification set forth in the SPA.

24      213.   Valcor's conduct also amounted to unfair business acts in violation of

25  the UCL.  Valcor worked to reduce Parker's share of the air separation module

26  market by improperly using the proprietary and confidential information it obtained

27  from Parker to create its modified ASMs.  Valcor also used the information it

28  secretly learned from investigating its defective ASMs' manufacturing defects, and

inability to perform in the in-service operating environment, to further develop its modified ASMs, Gen2 and Gen3.  Valcor, through Electroid, was contractually and legally obligated to share this information with Parker, but instead concealed it, leaving Parker to continue to purchase Electroid's defective ASMs.  Valcor instead took its modified and improved ASMs directly to Parker's customers and competitors, to attempt to reduce Parker's market share.

214.   Valcor's conduct was of little utility as compared to the harm it caused Parker, which included the loss of valuable contracts to supply NGS components in other aircraft models.  Valcor went so far as to target some of the same potential contracts that it knew Parker was working hard to obtain, even though such conduct by Valcor was a direct violation of the SPA.

215.   As a direct and proximate result of its unfair conduct, Valcor, through Electroid, has been unjustly enriched at Parker's expense by utilizing Parker's proprietary and confidential information to directly compete against Parker and attempt to reduce Parker's market share.

216.   Also, as a direct and proximate result of its unfair conduct, Valcor has harmed Parker by causing it to lose lucrative contracts with key customers and by causing Parker to unknowingly expend time, money and resources to investigate the ASM failures.  Parker would not have undertaken such measures had it known that Electroid's ASMs were suffering from dangerous defects that were known only to Valcor, through Electroid, and which resulted from Electroid's defective manufacturing and failure to make a product that complied with the specification in the SPA.

217.   Parker seeks restitution and disgorgement of all amounts improperly gained by Valcor, through Electroid, and lost by Parker's as a result of Valcor's unlawful and unfair conduct in an amount to be determined at trial but believed to be in excess of $70,000,000.

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

### Fifth Counterclaim

### (Declaratory Judgment)

218.   Parker realleges and incorporates paragraphs 1 through 217 as if set forth in full herein.

219.   There is an actual controversy relating to the legal rights and duties of the parties to this action.

220.   A judicial declaration or determination is necessary at this time regarding the legal rights and duties of the parties.

221.   Specifically, Parker requests a judicial declaration that it did not breach the SPA, that it has the right to terminate the SPA, that it has the right under the SPA to seek an alternative source to supply the products under the SPA without repercussion, and that it is entitled to reimbursement from Valcor for all of Parker's costs of replacing the products and all other damages.

### PRAYER FOR RELIEF

WHEREFORE, Parker prays for judgment against Valcor on each of the Counterclaims alleged herein, as follows:

(a)   For general and direct damages according to proof, but alleged to be in excess of $80,000,000;

(b)   For special and consequential damages according to proof loss of reputation, market share and good will, but alleged to be in excess of $200,000,000;

(c)   For lost profits according to proof, but alleged to be in excess of $200,000,000;

(d)   For damages arising from Valcor's fraudulent conduct according to proof, but alleged to be in excess of $200,000,000;

(e)   For punitive damages according to proof, but alleged to be in excess of $750,000,000;

(f)     For restitution of all amounts improperly gained by Valcor through its Electroid division and lost by Parker as a result of Electroid's unlawful and unfair conduct according to proof but alleged to be in excess of $70,000,000;

(g) For a judicial declaration that Parker did not breach the SPA, that it has the right to terminate the SPA, that it has the right to seek an alternative source to supply the products under the SPA without repercussion, and that it is entitled to reimbursement from Valcor for all of Parker's costs of replacing the products and all other damages;

(h)     For interest at the maximum legal rate;

(i)     For costs of suit incurred herein; and

(j)     For such other and further relief as this Court deems just and proper.


Dated:  February 12, 2018                    TROUTMAN SANDERS LLP


                                             By:  /s/ Paul L. Gale
                                             Paul L. Gale
                                             Peter N. Villar
                                             Lauren E. Grochow
                                             Nicholas J. Schuchert

                                             Attorneys for Defendant and
                                             Counterclaimant
                                             PARKER HANNIFIN
                                             CORPORATION

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

1

## **DEMAND FOR JURY TRIAL**

2      In accordance with Fed. R. Civ. P. 38, Parker demands a trial by jury on all

3  issues so triable.

4

5  Dated:  February 12, 2018                    TROUTMAN SANDERS LLP

6                                              By:  /s/ Paul L. Gale

7                                                Paul L. Gale
                                                 Peter N. Villar
8                                                Lauren E. Grochow
                                                 Nicholas J. Schuchert
9
                                                 Attorneys for Defendant and
10                                               Counterclaimant
                                                 PARKER HANNIFIN
11                                               CORPORATION

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

33902881

- 56 -

PARKER HANNIFIN CORPORATION'S SECOND AMENDED COUNTERCLAIM